Simbi WATERS, et al., Plaintiffs,

v.

Marion BARRY, Jr., et al., Defendants.

Civ. No. 89–0707 (CRR).

United States District Court,
District of Columbia.

May 24, 1989.

Arthur B. Spitzer and Elizabeth Symonds, American Civil Liberties Union Fund of the Nat. Capital Area, Washington, D.C., for plaintiffs.

Victor E. Long and Robin C. Alexander–Smith, Asst. Corp. Counsel for District of Columbia, with whom Frederick D. Cooke, Jr., Corp. Counsel, Martin L. Grossman, Deputy Corp. Counsel, and Arthur D. Burger, Chief, General Litigation Section, were on the briefs, Washington D.C., for defendants.

## OPINION

CHARLES R. RICHEY, District Judge.

### I. *Introduction*

The District of Columbia, like most major metropolitan areas and many rural communities, is in the midst of a crisis. As the local and national media daily report, the sale and use of illicit drugs in the District of Columbia has combined in recent years with long-standing problems of economic and social inequity to create an unprecedented explosion of violence. The drug scourge and its accompanying violence tend to make victims of those who can bear it least: the poor, minorities and the disadvantaged.

The disease is undisputed; the question is how to cure. Facile, knee-jerk responses will not suffice. Just as mere punishment will never cure the drug addict, so mere martial tactics will never wean the District from its addiction to violence and illegal trafficking in drugs. Having said this, the Court emphasizes that any legislative response to the District's crisis is none of this Court's business, except insofar as it may impact upon the constitutional rights of the District's citizenry. The Mayor and the members of the City Council are the District's elected officials, and thus are entitled to deference as the Court reviews the District's response to the current situation.

One such response, at issue in this lawsuit, is the decision of the District's elected officials to establish a nighttime juvenile curfew in the District of Columbia. The curfew statute (the "Act") would,[1] with certain general exceptions, make it illegal for persons below the age of 18 to be on the streets of the District between 11:00 p.m. and 6:00 a.m.[2] In addition to sanctioning the juveniles who violate the curfew, the Act would levy fines against the juveniles' parents.

The stated objectives of the Act are to reduce the incidence of juvenile violence, both against and by juveniles, to reduce juveniles' exposure to drug trafficking and other criminal activity, and to aid parents and others responsible for juveniles in carrying out their supervisory obligations. The curfew has a stated term of 90 days. If, however, the Mayor is satisfied with the curfew, he may request that it be "continued" for an additional undefined period.[3]

The plaintiffs—a group of minor and near-minor residents of the District, several parents of minors, and individuals affiliated

---

1. The statute currently before the Court is the Temporary Curfew Emergency Act of 1989, No. 8–325. The Council of the District of Columbia approved the statute on April 4, 1989, and Mayor Marion Barry signed it on April 14, 1989. The full text of the statute is attached hereto as Appendix A.

2. These hours would obtain on weekdays; on Fridays and Saturday evenings, the curfew would begin at midnight.

3. The record indicates that City Councilman Frank Smith, the moving force behind the drive for a curfew, has introduced, and the City Council has approved, a slightly revised version of the Act which would have a 255–day term rather than a 90–day term. That statute is now before Congress pursuant to D.C.Code § 1–233(c)(1); if Congress does not disapprove the statute within 30 days, the statute will become effective. The plaintiffs have moved to amend their complaint to challenge the statute now before Congress, as well as the Act. The Court, however, will not rule on the plaintiffs' motion to amend until the District has responded, something the District has not done as of this writing. This being the case, the Court will retain jurisdiction over this matter (i.e., the case will not be dismissed, notwithstanding the decision reached herein) until the Court has had the benefit of full briefing on the plaintiffs' motion to amend.

with religious organizations—have challenged the Act.[4] They allege that the Act, if enforced, would work an unacceptable infringement of their First, Fourth and Fifth Amendment rights. On April 20, 1989, the date the Act was to have gone into effect, the plaintiffs obtained a temporary restraining order barring its enforcement, 711 F.Supp. 1121. The District subsequently agreed to an extension of the temporary restraining order until the Court had an opportunity to render a decision on the merits. The parties have now filed cross motions for summary judgment, and, as there are no disputes as to material facts, the matter is ripe for decision.

Notwithstanding the deference the Court must show all legislation, the Court is constrained to conclude that the Act is constitutionally unacceptable. The Act cannot be implemented without violating the constitutional rights of thousands of innocent minors. As this Court has previously stated, we cannot throw the baby out with the bathwater in our efforts to deal with the problems that beset us. Because the Act does so, the Court will permanently enjoin its enforcement.

The Court first addresses certain preliminary matters. The Court will then proceed to describe its reasoning on the merits of these important constitutional issues.

## II. *Preliminary Matters*

### A. Justiciability

■ The District first challenges the plaintiffs' right to maintain this action. According to the District, the doctrine of "justiciability," and the claimed lack thereof in this case, preclude this lawsuit. The factual core of the District's position is the preenforcement nature of the plaintiffs'

challenge to the Act. Because none of the named plaintiffs have been detained or otherwise sanctioned under the Act, and because no one else has either, the District argues that the plaintiffs' claims, at this stage, are merely "abstract" and "speculative."[5] Such claims, the District suggests, cannot presently sustain federal jurisdiction. According to the District, the plaintiffs' claims run afoul of Article III's requirement that every federal adjudication involve a live "case or controversy."[6]

■ In the Court's view, the District's position is unduly formal; it places unwarranted emphasis upon the distinction between a preenforcement challenge and a post-enforcement challenge. The distinction, after all, is simply one of fact which may or may not be relevant in a particular case. Contrary to the logic of the District's position, an action does not become justiciable merely because enforcement has occurred, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), nor is an action non-justiciable *per se* because enforcement has *not* occurred. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988).

The question, properly stated, is whether the real adversity between the parties as to dispositive issues supports the conclusion that those issues have been properly and vigorously presented for adjudication. In the preenforcement context, that standard is satisfied when the "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them." *American Booksellers*, 108 S.Ct. at 642. *See also Babbitt v. United Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60

---

**4.** The plaintiffs' initial complaint challenged the Short Term Curfew Emergency Act of 1989, a predecessor to the Act which the Council had enacted on February 28, 1989. This Court enjoined enforcement of the Short Term Act on March 20, 1989. After the Court's action, the Council returned to the drawing board and subsequently produced the Act, which, upon its adoption, repealed the Short Term Act. The plaintiffs immediately amended their complaint to incorporate a challenge to the Act. This latter challenge is the one now before the Court.

**5.** It is perhaps worth noting that the District has established relatively detailed regulations intended to guide the Metropolitan Police Department in enforcing the provisions of the Act. It thus appears that the District has every intention of vigorously enforcing the Act should it be found free of constitutional defects.

**6.** Although the District's precise reasoning is not always clear, it appears that the District places greatest reliance upon the "ripeness" aspect of the justiciability doctrine.

L.Ed.2d 895 (1979) (preenforcement plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute"); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974) (facts established well-founded fear of enforcement); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973); *McCollester v. City of Keene,* 668 F.2d 617, 619 (1st Cir.1982) (discussing standing in context of preenforcement challenge to curfew statute).

When First Amendment concerns are raised, the danger that "law abiding" behavior will result in self-censorship serves to heighten Article III's sympathy toward preenforcement challenges. *See American Booksellers,* 108 S.Ct. at 642 ("Further, the alleged danger of this statute is, in large measure, one of self-censorship, a harm that can be realized even without an actual prosecution."); *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965) ("Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser").[7]

Here, the plaintiffs have undeniably established that they have engaged in past acts which would be prohibited if the Act were enforced. The record indicates that the minor plaintiffs have all participated in activities that have required their presence on the streets of the District after the curfew deadlines, and that they wish to continue to do so. Of equal importance, however, is the record's clear indication that the plaintiffs would abide by the Act if it were enforced—the plaintiffs would curtail their involvement with perfectly lawful (but potentially nocturnal) activities in order to conform their behavior to law. It thus seems to the Court that the minor plaintiffs satisfy Article III from two perspectives. First, if they continue their prior practices without modification, they will clearly run afoul of the Act. A decision to do so would provide the plaintiffs with "an actual and well-founded fear" of prosecution under the Act.[8] Second, if they abstain from legitimate activities, they will have engaged in precisely the type of self-censorship that concerned the Supreme Court in *American Booksellers.* Citizens for whom the rule of law has meaning should not be deprived of their day in court *because* of their compliance with the law; silent but involuntary relinquishment of constitutional rights is, in this Court's view, an immediate and ripe "harm." It is a harm that perhaps lacks the immediate drama of a full arrest and prosecution, as well as the awful consequences that follow,[9] but

7. The District's "justiciability" argument shares to some extent the qualities of an argument that the Court should abstain from deciding this matter until the "state" courts of the District of Columbia are able to give the Act a definitively constitutional construction. The thread common to both arguments is the hope that an "as applied" record, coupled with a "state"-level judicial interpretation of the Act, would provide sufficient concreteness to satisfy Article III, as well as allay any federalism concerns that an immediate adjudication in this Court might generate. Setting aside the issue of whether the typical federalism concerns are present when the District of Columbia is involved, the Court simply notes that abstention appears to be disfavored when serious facial challenges are made to statutes under the First Amendment. *See City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2512–13, 96 L.Ed.2d 398 (1987) (abstention inappropriate where facial challenge made to unambiguous statute); *Dombrowski,* 380 U.S. at 489–90, 85 S.Ct. at 1122–23.

8. *Cf. Clements v. Fashing,* 457 U.S. 957, 962, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) (justiciable case or controversy where "appellees have alleged in a precise manner that, but for the sanctions of the constitutional provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision").

9. The District has indicated that it intends to expunge any record of an arrest pursuant to the Act that might be contained in a juvenile's file once the juvenile reaches the age of 18. Nevertheless, the Court takes judicial notice of the fact that we live in a computerized information society in which little or nothing can be hidden. The fact of an arrest pursuant to the Act, despite expungement of the official record of that arrest from a juvenile's file, may haunt a juvenile years later when he or she may be required to either lie or disclose the arrest in any of the hundreds of applications and other forms that we all fill out in the course of our lives. Em-

it is a harm that nevertheless carries great constitutional significance.

The District places great reliance upon the First Circuit's decision in *McCollester v. City of Keene*, 668 F.2d 617 (1st Cir. 1982), which also involved a challenge to a minor curfew ordinance. In *McCollester*, the court held that the plaintiff had failed to make out a justiciable case or controversy, and therefore directed that the plaintiff's complaint be dismissed. In *McCollester*, however, the court placed great emphasis upon the plaintiff's failure to give any indication of her past conduct or the conduct she intended to undertake in the future. It appears that the plaintiff alleged only (1) that she was a minor at the time of the complaint, and (2) that the defendants had actually enforced the ordinance by arrest and prosecution (but not against her). *Id.* at 618. In addition, the court noted a discrepancy between the avowed purposes of the ordinance—to restrict disorderly juvenile behavior—and its apparently broad scope, which by its terms prohibited perfectly innocuous nocturnal conduct. The court concluded that these two factors—the plaintiff's fact-free complaint, and the potentially limited scope of the ordinance—worked together to remove a facial likelihood that the plaintiff would ever be prosecuted. *Id.* at 621.

The factors deemed significant in *McCollester* are not present in this case. The plaintiffs here have provided detailed and undisputed descriptions of their past activities, activities which they hope to continue. It is manifestly apparent that the bulk of these activities, if not modified, would be proscribed by the Act. Further, unlike the situation in *McCollester*, the expressed purposes of the Act do not suggest that the Act's application would or should be limited only to certain forms of juvenile behavior. The Act's stated objectives are to *protect* juveniles from nocturnal evils: thus, any time a juvenile were discovered about at

night, he or she would presumably be "in danger" and therefore susceptible of arrest and detention. A contrary construction or application of the Act would depart from the Act's expressed purposes. In *McCollester*, on the other hand, a limiting construction or application would have been consistent with the ordinance's expressed objectives. The factors which counseled hesitation in *McCollester* are therefore absent in this case, and the Court declines to reach a similar result.

For the foregoing reasons, the Court concludes that the plaintiffs' claims present a justiciable case or controversy. The District's motion for summary judgment on this point will be denied.

### B. Class Certification

The plaintiffs filed their complaint in this action on behalf of a putative class, and now move for certification pursuant to Fed. R.Civ.P. 23(a) and 23(b)(2). The plaintiffs define the class for which they seek certification as including

> all minors in the District of Columbia, all parents of minor children in the District of Columbia, all stepparents, grandparents, uncles, aunts, adult friends and other adults who will be prevented from acting *in loco parentis* to minors in the District of Columbia during curfew hours, all young adults in the District of Columbia who might appear to a police officer to be minors, all for-profit corporations that will suffer harm because of the discrimination against them in the curfew law, and all persons and organizations whose exercise of political, cultural, religious or associational activities will be impaired because of the application of the curfew law to them, their co-religionists or associational companions.

Plaintiffs' Motion for Class Certification at 1–2.[10]

ployment and insurance application forms, as well as forms for admission to the District of Columbia bar, are examples of that come readily to mind.

**10.** Although the plaintiffs' immediate rationale for seeking class certification is apparent—a de-

sire to avoid a potential mootness problem as the matter progresses—the Court is less certain as to why the District has chosen to oppose such certification. Given that the plaintiffs' challenge to the Act is a *facial* challenge, which seeks only declaratory and injunctive relief, it

■ The Court finds that the stated class satisfies the standards articulated in Fed.R.Civ.P. 23(a). Obviously, such a class, which would consist of thousands (if not hundreds of thousands) of individuals, is so numerous as to render joinder impracticable. There are questions of law or fact common to all members, namely, the existence of a curfew law that is alleged to infringe upon their constitutional rights. The theories under which each of the named plaintiffs proceed inform the class definition; thus, the claims of the named plaintiffs are typical of the claims of the class members. Finally, the competence and dedication of the plaintiffs' counsel leaves the Court utterly without doubt that the named plaintiffs will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23(a)(1)–(4).

■ The Court is further convinced that the putative class satisfies the requirements of Rule 23(b)(2). By implementing the Act, the District has "acted or refused to act on grounds generally applicable to the class." Further, it has been held that class certification under Rule 23(b)(2) is particularly appropriate "where, as here, the claims of the members of the class may become moot as the case progresses."

*Johnson v. City of Opelousas,* 658 F.2d 1065, 1070 (5th Cir.1981) (certifying class challenging juvenile curfew ordinance).

■ The District opposes the proposed class on the grounds that not all members oppose the curfew; the District offers the eminently plausible suggestion that, of the thousands of class members, more than a few favor imposition of a curfew.[11] From this fact, the District argues that the named plaintiffs' claims are not typical of those of the class members, and that the named plaintiffs will not fairly and adequately protect the interests of the class.[12]

■ The Court agrees that the proposed class will inevitably include individuals who favor the curfew. In matters of this type, involving a class of this size, differences of opinion are unavoidable. Nevertheless, diversity of opinion within a class does not defeat class certification. *See Lanner v. Wimmer,* 662 F.2d 1349, 1357 (10th Cir. 1981) ("The fact that the class may have included persons who support the [challenged] program does not offend the principles set down in *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). It is not 'fatal if some members of the class might prefer not to have violations of their

seems that the District would derive no benefit from defeating the plaintiffs' class certification request. To the contrary, a certified class would seem effectively to preclude subsequent challenges by differently situated defendants should the District prevail, either in this Court or on appeal. The Court wonders if the District has opposed the putative class merely "because the plaintiffs requested it, and [they] always oppose everything plaintiffs request[ ]." *See* Wilton, *The Class Action in Social Reform Litigation: In Whose Interest?,* 63 B.U.L.Rev. 597, 599–600 (1983) (suggesting that Rule 23(b)(2) classes always benefit defendants and disadvantage plaintiffs).

11. In particular, the District cites several letters from prominent community leaders which ask the Mayor and the Council to adopt a curfew. *See* Defendants' Exhibit G (letter from Judy Fredette, Advisory Neighborhood Commissioner); Defendants' Exhibit H (letter from Tony Nichelson, Chairman of the Youth Offender Outreach Project for Concerned Black Men, Inc.).

12. Although the District apparently seeks to bifurcate its position into separate arguments under both Rule 23(a)(3) and 23(a)(4), the Court

regards the gist of the District's argument—that the interests of the named plaintiffs are not perfectly congruent with those of each member of the class—as arising under Rule 23(a)(4). As stated in *Horton v. Goose Creek Ind. School Dist.,* 690 F.2d 470, 485 n. 27 (5th Cir.1982):

Intra-class antagonisms may be analyzed under either Rule 23(a)(4), the adequacy requirement or Rule 23(a)(3), the typicality requirement. . . . The requirements are closely related, for demanding typicality on the part of the representative helps ensure his adequacy as a representative. We prefer to analyze the question of intra-class antagonism under the requirement that the representative protect adequately the interests of the class rather than under the requirement that his claims be typical, because each class member *has* the claim asserted by the plaintiffs, so the plaintiffs' claims are typical, but many members do not see it as in their best interests to assert that claim. The real question then is whether, in spite of the typicality of their claims, the named plaintiffs can adequately represent the interests of the class, including any interest in not asserting claims.

rights remedied.' ") (quoting *United States Fidelity & Guaranty Corp. v. Lord,* 585 F.2d 860, 873 (8th Cir.1978)); [13] *Wilder v. Bernstein,* 499 F.Supp. 980, 993 (S.D.N.Y. 1980) ("The fact that some members of the class may be satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a).").

The circumstances of this particular case augment the Court's conclusion that the interests of the class are not *antagonistic* to those of the named plaintiffs. *See Nat'l Ass'n for Mental Health, Inc. v. Califano,* 717 F.2d 1451, 1458 (D.C.Cir.1983) (disqualification under Rule 23(a)(4) requires "antagonistic or conflicting interests with the unnamed members of the class"). Should the plaintiffs succeed in their challenge to the Act, those members of the class who favor the curfew will not be affected in the least; they may still unilaterally obey the Act's time limits and thereby further each of the objectives articulated in § 3 of the Act.[14] The "conflict" or "antagonism" present here is thus largely theoretical; it is fundamentally different from the situation in which a successful class suit would somehow alter the rights or obligations of the dissenting class members.

For the foregoing reasons, the Court concludes that the plaintiffs have satisfied the prerequisites to maintenance of a class action, and will order the certification of such a class in accordance with the plaintiffs' request.

### III. *Constitutionality of the District's Curfew Legislation*

The plaintiffs' challenge to the Act contains four essential components. The first, and the centerpiece of this lawsuit, is the plaintiffs' claim that the Act infringes upon the First and Fifth Amendment rights of thousands of minors who live or visit the city but who have not engaged, and never will engage, in any type of illegal behavior. Because of this, the plaintiffs argue that the Act is unconstitutionally overbroad on its face. The second component is the plaintiffs' claim that enforcement of the Act would subject minors and near-minors to unreasonable searches and seizures in violation of their Fourth Amendment rights. The plaintiffs' third argument is that the Act violates minors' rights to equal protection by drawing an unjustifiable distinction between minors and non-minors. Fourth, and finally, the plaintiffs contend that the Act burdens the rights of parents (and others acting *in loco parentis*) to shepherd their childrens' upbringing, and thereby infringes upon such persons' Fifth Amendment liberty and privacy interests. The Court finds for the plaintiffs under its First Amendment, due process and equal protection claims, but rejects plaintiffs' Fourth Amendment claim. In light of these holdings, the Court does not reach the plaintiffs' claim that the act intrudes upon the due process rights of parents of juveniles subject to the Act, although this contention may also have some merit in the context of this case.

### A. First Amendment and Fifth Amendment Challenge

The plaintiffs first contend that the Act is substantially overbroad, and thus violates the First and Fifth Amendments on its face. Although the Court agrees that the Act is in facial violation of the associational rights of minors, as well as of minors' fundamental liberty interests, the Court does not agree that an overbreadth analysis is appropriate in this instance.

---

**13.** It is worth noting that the District's opposition to the proposed class places principal reliance upon *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

**14.** Section 3 of the Act states as follows:
 (a) The purpose of this act is to protect the welfare of minors by:
 (1) Reducing the likelihood that minors will be the victims of criminal acts during the curfew hours;

 (2) Reducing the likelihood that minors will become involved in criminal acts or exposed to drug trafficking during the curfew hours; and
 (3) Aiding parents in carrying out their responsibility to exercise reasonable supervision of the minors entrusted to their care.

The Court first discusses its reasoning on this issue, and then proceeds to describe why the Act is nevertheless facially invalid under the First and Fifth Amendments.

The plaintiffs contend that the Act, by rendering illegal myriad activities that would otherwise find protection under the First and Fifth Amendments, is substantially overbroad and thus facially unconstitutional. *See City of Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application"); *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940) (a law is void on its face if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise" of First Amendment rights). Even if the District's goals in effecting a curfew are proper, and even if it is possible to isolate some nucleus of activity against which the Act may properly be directed, the plaintiffs contend that the District may not sacrifice the legitimate constitutional interests of the many to punish the few.

■ In framing their case as an overbreadth challenge, the plaintiffs seem to ignore the fact that the overbreadth doctrine is essentially a *jus tertii* device; it evolved in order to permit one properly charged under a statute to raise the First Amendment rights of others, not charged, whose associational or expressive rights might be chilled by enforcement of overly broad legislation. However, when, as here, the plaintiffs are themselves engaged in protected activity—when the challenged statute would have no greater impact upon the rights of nonparties than it would have upon the rights of the parties before the

Court—there is no need to employ a traditional overbreadth analysis. *See, e.g., City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801–02, 104 S.Ct. 2118, 2126–27, 80 L.Ed.2d 772 (1984); *NAACP v. Richmond*, 743 F.2d 1346, 1352 (9th Cir.1984); *Brandt v. State Farm Mutual Auto Ins. Co.*, 693 F.Supp. 877, 881–82 (E.D.Cal.1988). *See also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (traditional overbreadth analysis inapplicable where "the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish"). The inapplicability of the overbreadth doctrine is particularly acute in this case, where a plaintiff class has been certified which, in essence, includes everyone who might be affected by the Act.[15]

■ The plaintiffs' effort to shoehorn traditional overbreadth analysis into this case is essentially an attempt to secure a particular remedy: facial invalidation of the Act as a whole. However, the plaintiffs need not rely upon a traditional overbreadth analysis to achieve this result. If the Act so egregiously intrudes upon constitutional interests that it is impossible to segregate permissible applications from impermissible applications, *see Sec'y of State of Maryland v. Munson*, 467 U.S. 947, 965–68, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984), or if the Act cannot be applied in a way that does not quash constitutional freedoms, *see Taxpayers for Vincent*, 466 U.S. at 796–97, 104 S.Ct. at 2124–25 (1984) (citing cases), then the Court may invalidate the Act on its face, rather than merely as applied. This form of direct "facial" challenge exists separate and apart from an "overbreadth" challenge. Indeed, any other result would have the ironic effect of granting greater powers of statutory inval-

---

**15.** The Court recognizes that a traditional overbreadth analysis appears to have been employed in several of the decisions which have previously considered the constitutionality of juvenile curfew statutes. *See, e.g., Johnson v. City of Opelousas*, 658 F.2d 1065, 1071 (5th Cir.1981); *McCollester v. City of Keene*, 586 F.Supp. 1381, 1385 (D.N.H.1984); *Ruff v. Marshall*, 438

F.Supp. 303 (M.D.Ga.1977); *Allen v. City of Bordentown*, 216 N.J.Super. 557, 524 A.2d 478, 482–84 (1987). Nevertheless, the Court is of the view that, while the remedy ultimately adopted in each—facial invalidation—may have been appropriate, the precise mode of analysis was to some extent flawed.

**1134**

idation to those whose activities are unprotected than to those whose activities are protected. *See* H. Hart & H. Wechsler, *The Federal Courts and the Federal System*, 194–95 (3d ed. 1988).

■ In this case, the plaintiffs' challenge to the Act is more in the nature of a direct facial attack than a traditional overbreadth attack, and the Court will treat it as such. Employing this analysis, it is apparent that the Act involves such a wide and indiscriminate denial of the First and Fifth Amendment rights of juveniles that it cannot be constitutionally applied. It must fall in its entirety.

■ The right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a free and ordered society. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972); *Bykofsky v. Borough of Middletown*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976) (Marshall, J., dissenting from denial of *certiorari*); *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). This right is rooted in the First Amendment's protection of expression and association, as well as (in this case) the Fifth Amendment's protection of fundamental liberty interests under the doctrine of substantive due process. *See, e.g., Coates*, 402 U.S. at 615, 91 S.Ct. at 1689 (considering right of association under First and Fourteenth Amendments); *Aptheker v. Sec'y of State*, 378 U.S. 500, 520, 84 S.Ct. 1659, 1671, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring) ("Freedom of movement is kin to the right of assembly and to the right of association."). [16] One has the right to move about, certainly in order to partake of activities that expand the mind and the soul, but also because the right to move about—if even for no reason—is a cherished end in itself. *See Papachristou*, 405 U.S. at 164, 92 S.Ct. at 844 (1972); *Gomez v. Turner*, 672 F.2d 134, 143–44 n. 18 (D.C.Cir.1982) ("That citizens can walk the streets, without explanation or formal papers, is surely among the cherished liberties that distinguish this nation from so many others.").

The Act casts these rights aside like so much straw. The Act subjects the District's juveniles to virtual house arrest each night without differentiating either among those juveniles likely to embroil themselves in mischief, or among those activities most likely to produce harm. The Act is a bull in a china shop of constitutional values.

A brief review of the record indicates the extent to which the Act tramples upon the associational and liberty interests of the named plaintiffs. These plaintiffs have been, and hope in the future to be, involved with high school social activities,[17] political activities,[18] scientific endeavors,[19] and religious pursuits[20] which often require their presence on the District's streets during the curfew period. Absent registration, these activities would disappear were the

---

**16.** The District cites the Supreme Court's recent decision in *City of Dallas v. Stanglin*, —— U.S. ——, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), for the proposition that (1) the activities at issue here are not protected under the First Amendment, and (2) the Court should therefore apply a rational basis test in evaluating the plaintiffs' equal protection challenge. *See infra* Section III(C). The Court disagrees. While *Stanglin* may exclude some of the nocturnal activities proscribed by the Act from First Amendment protection, it by no means establishes that the Act is therefore constitutional. The issue in *Stanglin* was whether "chance encounters in dance halls," involving "hundreds of teenagers," would find protection within the First Amendment. The Supreme Court determined that they do not. Unlike the ordinance at issue in *Stanglin*, however, the Act operates in much more of a blunderbuss fashion; while it proscribes "chance encounters" in dance halls and other forms of random association, it would also effectively prohibit on its face forms of nocturnal expression and association that would clearly fall within the ambit of the First Amendment. Given that the Act is much broader than the ordinance addressed in *Stanglin*, it does not follow from *Stanglin* that the Act does not violate the First Amendment on its face, or that a rational basis test should be employed in evaluating the plaintiffs' equal protection challenge.

**17.** *See* Declaration of David Dranitzke at 3.

**18.** *See* Declaration of Franklin Foer at 1–2.

**19.** *See* Declaration of Maxwell Mirell at 1–2.

**20.** *See* Declaration of Franklin Foer at 2–3.

Act enforced. Moreover, the specific examples contained in the record say nothing of the countless legitimate but undocumented pursuits which would be denied juvenile members of the plaintiff class if the Act were enforced. The right to a late-night game of basketball, to sit in the open air on a muggy summer night, or to walk home at one's leisure from an unregistered church or synagogue, or from a party at a friend's home, would all be denied. As the court in *McCollester v. City of Keene,* 586 F.Supp. 1381 (D.N.H.1984), stated in striking down a juvenile curfew law, "[e]ven a juvenile on a solitary, totally innocent excursion with parental permission, such as stargazing, sitting on the sidewalk near his house, or taking a late evening walk during curfew hours would be in violation of the ordinance." *Id.* at 1385. The court in *McCollester* concluded that the Constitution will not abide such a result, and this Court agrees.

As the District properly points out, the rights at issue here are not absolute.[21] Yet, as the plaintiffs just as properly respond, when government undertakes to limit these rights in some manner, it must act gingerly; it must do so in a manner that is narrowly focused on the harm at hand, as well as sensitive to needless intrusions upon the constitutional interests of the innocent. *See Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) (First Amendment right of association); *Aptheker v. Secretary of State,* 378 U.S. 500, 508, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992 (1964) (legitimate state end "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved") (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)).

The Act fails this test. The District has sought to achieve its objectives by means of a device that "broadly stifle[s] fundamental personal liberties." The Court recognizes that, in the eyes of many, the crippling effects of crime demand stern responses. With the Act, however, the District has chosen to address the problem through means that are stern to the point of unconstitutionality. Rather than a narrowly drawn, constitutionally sensitive response, the District has effectively chosen to deal with the problem by making thousands of this city's innocent juveniles prisoners at night in their homes.

The District defends the reasonableness of its response by emphasizing two essential points: (1) the fact that the Act contains several exceptions to its prohibition of nocturnal activity; and (2) the allegedly reduced constitutional interests of juveniles under these circumstances.

It is true that the Act's prohibitions are not absolute. The Act exempts minors traveling in automobiles,[22] minors accompanied by parents (but not others), minors returning by a direct route from a pre-registered religious or other non-profit activity, so long as it is within 60 minutes of the activity's termination, a minor engaged in legitimate employment who has on his person a valid work or theatrical permit, and a minor required by "reasonable necessity" to conduct an emergency errand relating to the health of a family member, so long as the minor has, if practicable, a note from a parent to that effect.

These exemptions represent a laudable effort on the District's part to conform the Act to the requirements of the Constitution. Indeed, the Act's legislative history makes clear that the Act, and particularly its exceptions, are patterned, albeit imprecisely, upon those contained in a juvenile curfew ordinance that withstood a constitutional challenge in *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242 (M.D.Pa.

---

**21.** The District's argument focuses exclusively upon the First Amendment. The District nowhere squarely addresses the due process analysis employed in cases such as *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981) (addressing both First Amendment and due process aspects of curfew law) and *McCollester v. City of Keene,* 586 F.Supp. 1381, 1384 (D.N.H.1984) (addressing only due process aspect of curfew law).

**22.** The Council's discussion of the Act indicates that it intended the automobile exception to pertain to travel on the Metro and the city's busses.

1975), *aff'd without op.*, 535 F.2d 1245 (3d Cir.1976), *cert. denied*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976). Although the Act's exceptions do not parallel those contained in the Middletown ordinance in every respect,[23] the similarities between the two curfews make clear that much of the activity permissible under the Middletown ordinance also would be permissible under the Act.[24]

Yet, it is what these curfews restrict, and not what they exempt, that matters most. The Act, even with its exemptions, prohibits every *innocent* juvenile in the District of Columbia from moving about this city as he or she pleases at night. Although the recent arguments in this Court might suggest otherwise, the Court remains certain that the number of such innocent juveniles far exceeds the number of juveniles in this city who might be bent on nighttime crime. The restriction, although perhaps by its nature silent, would be massive. Every juvenile in the District of Columbia would be arrested if he or she sought to wander the monuments at night, or if he or she sought to gaze at the stars from a public park. The Act's exemptions are substantial and constitutionally significant; yet, in the final analysis, the Act cannot help but "broadly stifle" the fundamental liberty interests of thousands of perfectly innocent, law-abiding juveniles who live in or who may visit the District of Columbia. From a First Amendment perspective, the Court cannot agree that the wholesale restriction of these juveniles' rights is "no greater than is essential" to furtherance of the District's interests. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (test for laws which incidentally impact upon protected First Amendment interests).

 The District's reliance upon the *Bykofsky* decision also suggests agreement with *Bykofsky*'s conclusion that the constitutional interests of minors are somehow less compelling than those of adults in this context. *Bykofsky*, 401 F.Supp. at 1256. The *Bykofsky* court's conclusion on this point is inseparable from its finding that the Middletown ordinance did not violate the due process rights of Middletown's minors. This Court, however, cannot agree with *Bykofsky* that the constitutional rights of minors are less deserving of constitutional protection than those of adults under these circumstances. The Court thus disagrees with the result of the *Bykofsky* court's due process balancing test.

In *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), a plurality of the Supreme Court articulated a general framework for determining when the state may give less deference to the constitutional rights of minors than to those of adults. The plurality noted three factors which may justify differential treatment in a given case: (1) "the peculiar vulnerability of children"; (2) "their inability to make crucial decisions in an informed, mature manner"; and (3) "the importance of the parental role in childrearing." *Id.* at 633–39, 99 S.Ct. at 3042–46.[25] An application of

---

**23.** This Court has previously recited the various ways in which the Act and the Middletown ordinance diverge. *See Waters v. Barry*, 711 F.Supp. 1121, 1122–1123 (D.D.C.1989) (granting temporary restraining order).

**24.** Although similar, the Act is more restrictive than the Middletown ordinance. Most importantly, the Middletown ordinance contained a broad exemption for the exercise of First Amendment rights (although it did require that advance notice be provided by the minor of an intent to exercise those rights). The Act contains no equivalent exemption. The Middletown ordinance also permitted adults other than parents to accompany juveniles during curfew hours. In these times of non-nuclear families, this difference is significant. The Middletown ordinance also permitted the Mayor to exempt by permit certain activities which, although not expressly dealt with in the ordinance, might clearly merit exemption. The Act does not permit such an exercise of mayoral discretion in this case.

**25.** Although only three members of the Court joined Justice Powell's articulation of these factors, the Justices who wrote separately (four concurring in the judgment, one dissenting) addressed different matters; none disputed the accuracy or relevance of Justice Powell's three criteria. These three factors, notwithstanding their expression in a plurality opinion, represent the Court's only reasoned discussion to date of the possible bases for distinguishing minors'

these criteria in this case makes clear that there is no basis for treating juveniles differently than adults; accordingly, the Act must fall.

As to the first factor, it is obvious that the plague afflicting the District poses no *peculiar* danger to children; those thousands of the District's juveniles who engage in wholly legitimate nocturnal activities are no more endangered in the current climate than are the District's adults. The violence is ubiquitous; it afflicts all of us. The Court therefore sees no reason to place a *peculiar* burden upon the constitutional rights of children, particularly when to do so would involve the deprivation of so much that may be valuable. *See Johnson,* 658 F.2d at 1073. *See also,* Note, *Assessing the Scope of Minors' Fundamental Rights: Juvenile Curfews and the Constitution,* 97 Harv.L.Rev. 1163, 1176 (1984) (a juvenile curfew "is an attempt to shelter [juveniles] from some unspecified future harm—an attempt that simultaneously forecloses many beneficial opportunities.").

The second factor is juveniles' "inability to make critical decisions in an informed, mature manner." The *Bellotti* Court elaborated: in certain situations, the state may "limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences." *Id.* at 635, 99 S.Ct. at 3043. In this Court's view, the decision to either stay inside or roam at night simply does not present the type of *profound* decision which *Bellotti* would leave to the state. A decision to leave the house at night does not ineluctably lead to nighttime violence; in all but the exceptional case, nocturnal activities, even by juveniles, will not have "serious consequences." For some, obviously, it will—but the decisions of these juveniles to engage in criminal activities is utterly different than, and made long prior to and for reasons wholly

separate from, their decisions to leave their homes either before or after 11:00 p.m.

The final *Bellotti* factor is the importance of the parental role in child-rearing. The District's curfew rests upon the implicit assumption that the traditional family unit, in which parents exercise control over their childrens' activities, has dissolved in many areas of this city. The Court has no doubt that such an assumption may be accurate with respect to many of this city's "families." Nevertheless, this assumption ignores the many thousands of the District's families for whom the ideal of family unity and parental control still lives. As to these families, struggling against the pressures of modern life, the Act gracelessly arrogates unto itself and to the police the precious rights of parenthood. Rather than furthering the parental role in child-rearing, the Court views the Act as frustrating the parental role in the vast majority of the District's families. *See Johnson,* 658 F.2d at 1073–74.

Applying the *Bellotti* factors, the Court thus holds that the context in which the District seeks to enforce the Act does not justify differentiating between the constitutional rights of minors and adults. This conclusion lends further support to the Court's finding that the Act, if enforced, would unconstitutionally burden on its face the First Amendment and Fifth Amendment due process rights of thousands of innocent juveniles in the District of Columbia.[26] However laudable the objectives which motivated its adoption, the Act is invalid on its face and may not be enforced.

### B. Fourth Amendment Challenge

■ The plaintiffs challenge on Fourth Amendment grounds those provisions of the Act which permit the arrest and detention of juveniles if they are unable to doc-

constitutional rights from adults. As such, *Bellotti* is generally cited as controlling in cases that require such a distinction, including cases addressing the constitutionality of juvenile curfew statutes. *See Johnson v. City of Opelousas,* 658 F.2d 1065, 1073 (5th Cir.1981); *McCollester v. City of Keene,* 586 F.Supp. 1381, 1385–86 (D.N.H.1984).

**26.** In light of this holding, the Court does not address the plaintiffs' contention that enforcement of the Act would infringe upon the rights of juveniles under the Free Exercise Clause of the First Amendment.

ument: (1) that they are properly on the street during the curfew period, or (2) that they are older than 18 years of age. The plaintiffs contend that the Act, by permitting such arrests and detentions, "repeals *pro tanto* the Fourth Amendment's protection of [juveniles], for ordinarily the police cannot constitutionally demand, on pain of arrest and detention, that a person whose behavior is in no way suspicious stop and provide identification." The plaintiffs argue that the Act "authorizes massive and utterly groundless seizures of young adults in the District of Columbia." Plaintiffs' Mem. in Support of Renewed Motion for Summary Judgment at 31–32.[27]

The Court disagrees. The plaintiffs' argument reflects, in essence, an attempt to find in the Fourth Amendment an absolute right to be free from searches and seizures, a right that cannot be limited by the government's power to criminalize certain forms of behavior. The Court finds no such absolute right in the Fourth Amendment. Instead, as the very language of the Fourth Amendment provides, a right to be free from such intrusions exists *only* so long as there is not probable cause to believe that an offense has been committed.

Here, the District has attempted to criminalize the public presence of juveniles during the curfew hours. Were they not otherwise unconstitutional, the proscriptions of the Act would provide, in fact, valid substantive references for determining the presence or absence of probable cause in a given case.[28] Although the purported crime is utterly simple—nocturnal, public youth—that simplicity causes the type of proof required to justify a search or seizure to be similarly uncomplex. Thus, were a police officer to reasonably conclude that an individual looked "young"—that he

or she looked like a minor—the officer would have "probable cause" to believe that the individual was engaged in an illegal act, i.e., being on the streets during the curfew period. If the individual could not prove that he or she was over 18, or that he or she fell within one of the Act's other exceptions, the officer would be entitled to place the individual under arrest. So long as the officer could reasonably have believed that the individual looked "young," the search, seizure or arrest would take place on the basis of probable cause and no Fourth Amendment violation would occur.

The Court thus rejects the plaintiffs' contention that the Act violates the Fourth Amendment on its face.

## C. Equal Protection Challenge

■ The plaintiffs contend that the Act, by drawing an impermissible distinction between juveniles and non-juveniles, violates the equal protection component of the Fifth Amendment. The Court agrees.

In order to survive an equal protection challenge, a statute which neither affects a fundamental right nor creates a "suspect" class need only show that it bears "some rational relationship to a legitimate state purpose." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). When, however, the challenged statute does create a suspect class, or when it does impinge upon a fundamental personal right protected by the Constitution, a higher level of scrutiny is required. When legislation burdens a suspect class, "strict scrutiny" is applied; the law will be sustained only if it is narrowly tailored to serve a compelling state interest. *McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13

---

**27.** At oral argument, counsel for the plaintiffs' asserted that the Act, in effect, is a "device intended to manufacture probable cause."

**28.** Stripped to its essentials, the plaintiffs' Fourth Amendment argument is essentially derivative of their claims under the First and Fifth Amendments. Although their argument is here framed in terms of the Fourth Amendment, they are ultimately complaining only of the arbitrariness and irrationality of the *substantive* offense

specified in the Act. And, as the Court's judgment proves, their complaints on this score are well taken. The plaintiffs' Fourth Amendment argument is thus redundant in light of their substantive challenges to the Act. At best it is contingent upon the success of those challenges—if those substantive challenges had failed, the Fourth Amendment would not provide an independent basis for facially invalidating the Act.

L.Ed.2d 222 (1964). "Similar" review is required when the challenged statute infringes upon a constitutionally protected interest. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing cases).

This Court has concluded herein that the Act directly burdens the First Amendment rights and Fifth Amendment liberty interests of the thousands of innocent minors who reside in or who may visit the District of Columbia. Accordingly, more than mere rationality is required; the standard applicable to the District's exercise of legislative judgment in this instance is whether the Act is narrowly tailored to serve a compelling governmental interest. While the District was undeniably motivated by a compelling governmental interest in adopting the Act, the Court is unable to conclude that the Act is narrowly tailored to serve that interest.

The articulated purpose of the Act is to protect juveniles from harm, to insulate them from the evils of the street. More broadly, of course, the unstated objective of the Act is to reduce the level of violence occurring in our city. The Act's distinction between juveniles and non-juveniles, however, furthers none of these objectives in a rational way, much less in a way that is narrowly tailored to reflect the nature of the problem. When fundamental interests are at stake, as here, the classification chosen bear an intimate relationship to the problem. Logic and the unrebutted evidence in the record, however, indicate that in this instance no such relationship exists. Indeed, it might even be said that, "in practical effect, the challenged classification simply does not operate so as rationally to further" the Act's express objectives. *United States v. Moreno*, 413 U.S. 528, 537, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973).

Logic is perhaps most fatal to the Act's constitutionality. In order to reasonably effectuate its ends, the Act must correctly assume that those juveniles who currently leave their homes at night to engage in drug trafficking, or to engage in other illegal, violent behavior, will be deterred from doing so by the existence of a curfew law. The naivete of such an assumption is striking.[29] Virtually everything that the Act seeks to thwart—violence, trade in illicit narcotics—is *already* illegal, and carries sanctions far more painful than a night of detention. Logic thus suggests that the only juveniles for whom the Act will likely have meaning will be those already inclined to obey the law. When fundamental interests are at stake, this inversion of anticipated effects renders the Act constitutionally unacceptable.

Moreover, the record indicates that the challenged classification bears little relation to the nature of the problem. In 1988, of the 26 juveniles killed in the District (out of 372 total killed, or 7%), not one was clearly killed at a time or place that he or she would not have been had the curfew been in effect.[30] Precisely half of these killings occurred in the juvenile's home.[31] As the plaintiffs point out, this would suggest that it is as dangerous in one's home as it is in the street. Moreover, according to the District's own figures, approximately half of the homicides in the District between 1985 and 1988 occurred during non-curfew hours.[32] The daytime would therefore appear to be just as hazardous as the night, at least in terms of homicides. Although these figures certainly paint a picture of a troubled city, they suggest that measures such as the Act are simply not so closely related to the protection of minors, or to curing the city's problems with drugs and violence, as to justify the infringement of constitutional interests.

29. *See* Declaration of Wallace Mlyniec at ¶ 3.

30. *See* Second Declaration of Dan Yakir. Mr. Yakir's Declaration contains no information with respect to three of the murdered juveniles. As to two others, the circumstances leave open the possibility that they may have been killed in a public place during curfew hours, although this apparently cannot be determined. *Id.*

31. *Id.*

32. *See* Juvenile Curfew Emergency Declaration Resolution of 1989 at § 2(c).

Because neither logic or the record permit the conclusion that the classification contained in the Act is narrowly tailored to achieve its expressed objectives, the Court concludes that the Act violates the equal protection component of the Fifth Amendment.[33]

## IV. *Conclusion*

There are no material facts in dispute; accordingly, summary judgment is appropriate as a matter of law under Fed.R. Civ.P. 56. As indicated, the Court holds that the plaintiffs are entitled to summary judgment on their claims under the First and Fifth Amendments, but that the defendants are entitled to summary judgment on the plaintiffs' claims under the Fourth Amendment. The Court further holds that the plaintiffs are entitled to certification of a class as defined herein. The Court will issue an Order in accordance with the foregoing.

## ORDER

Upon consideration of the motions and memoranda submitted by the parties to the above-captioned action, and after hearing oral argument, it is, by the Court, this 24th day of May, 1989,

ORDERED, that the plaintiffs' motion for class certification pursuant to Fed.R. Civ.P. 23(a) and 23(b)(2) shall be, and hereby is, granted, and that the plaintiff class shall include all minors in the District of Columbia, all parents of minor children in the District of Columbia, all step-parents, grandparents, uncles, aunts, adult friends and other adults who will be prevented from acting *in loco parentis* to minors in the District of Columbia during curfew hours, all young adults in the District of Columbia who might appear to a police officer to be minors, all for-profit corporations that will suffer harm because of the discrimination against them in the curfew law, and all persons and organizations whose exercise of political, cultural, religious or associational activities will be impaired because of the application of the curfew law to them, their co-religionists or associational companions; and it is further

ORDERED, that, for the reasons contained in the Opinion of the Court issued on this date, the plaintiffs' motion for summary judgment shall be granted as to those claims arising under the First and Fifth Amendments to the United States Constitution, and plaintiffs' motion as to those claims arising under the Fourth Amendment shall be, and hereby is, denied; and it is further

ORDERED, that, for the reasons contained in the Opinion of the Court issued on this date, the defendants' motion for summary judgment shall be denied as to those claims arising under the First and Fifth Amendments to the United States Constitution, and defendants' motion as to those claims arising under the Fourth Amendment shall be, and hereby is, granted; and it is further

ORDERED, that the District of Columbia "Temporary Curfew Emergency Act of 1989" shall be, and hereby is, declared unconstitutional, void and unenforceable; and it is further

ORDERED, that the defendants and each of them, their agents, servants, and employees, and all persons acting under their direction or in concert with them, are hereby permanently restrained and enjoined from implementing or enforcing in any manner the terms of the District of Columbia "Temporary Curfew Emergency Act of 1989"; and it is further

ORDERED, that the Clerk of the Court shall return to plaintiffs the $100 cash bond posted by them in this action on March 20, 1989; and it is further

ORDERED, that the defendants shall pay to plaintiffs their costs and reasonable attorney's fees herein, upon plaintiffs' ap-

---

**33.** In light of this holding, the Court does not address the plaintiffs' contention that the Act draws irrational distinctions between those juveniles that have the use of motor vehicles and those that do not, that it draws irrational distinctions between activities sponsored by for-profit and non-profit organizations, and that it draws irrational distinctions between those types of juvenile employment that require work permits and those that do not. *See* Plaintiffs' Amended Complaint ¶¶ 53–55.

plication therefore, which shall be filed within 40 days of the date of this Order; and it is further

ORDERED, that the Court shall retain jurisdiction over this matter in order to determine whether the plaintiffs' complaint should be amended in the manner requested in their motion filed May 18, 1989.

APPENDIX A

Codification, District of Columbia Code (1989 Supp.)
AN ACT

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

To impose, on an emergency basis, a curfew on minors in the District of Columbia.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Temporary Curfew Emergency Act of 1989".

Sec. 2. Definitions.

(a) "Parent" means a natural or adoptive parent or any person who has legal custody by court order or by marriage.

(b) "Minor" means any person under the age of 18 years, but does not include a judicially emancipated minor.

(c) "Narcotic trafficking" means the act of engaging in any prohibited activity related to narcotic drugs or controlled substances as defined in the District of Columbia Uniform Controlled Substances Act of 1981, effective August 5, 1981 (D.C. Law 4-29; D.C.Code, sec. 33-501 *et seq.*).

Sec. 3. Purpose.

(a) The purpose of this act is to protect the welfare of minors by:

(1) Reducing the likelihood that minors will be the victims of criminal acts during the curfew hours;

(2) Reducing the likelihood that minors will become involved in criminal acts or exposed to drug trafficking during the curfew hours; and

(3) Aiding parents in carrying out their responsibility to exercise reasonable supervision of the minors entrusted to their care.

Sec. 4. Curfew; authority and enforcement.

(a) The Council of the District of Columbia ("Council") imposes a curfew on minors in the District of Columbia ("District") between the hours of 11:00 p.m. and 6:00 a.m. each day, except that on Friday and Saturday evenings the curfew shall commence at 11:59 p.m. ("curfew hours").

(b) It shall be unlawful for a parent knowingly to permit or, by negligent failure to exercise reasonable control, allow his or her minor child to remain on any street, sidewalk, park, or other outdoor public place within the District during the curfew hours.

(c) It shall be unlawful for any minor to remain in or upon any street, sidewalk, park, or other outdoor public place in the District during the curfew hours.

(d) This section shall not apply:

(1) When a minor is accompanied by a parent;

(2) When a minor is returning home by way of a direct route from an activity that is sponsored by an educational, religious, or non-profit organization within 60 minutes of the termination of the activity, if the activity has been registered with the Mayor in advance;

(3) When a minor is traveling in a motor vehicle;

(4) When a minor is acting within the scope of legitimate employment pursuant to An Act To regulate the employment of minors within the District of Columbia, approved May 29, 1928 (45 Stat. 998; D.C. Code, sec. 36-501 *et seq.*), and the minor has in his or her possession a copy of a valid work or theatrical permit or an affidavit from the employer; or

(5) When, due to reasonable necessity:

(A) A minor who is a custodial parent is engaged in an emergency errand that is directly related to the health or safety of

his or her child and the minor describes the nature of the health or safety emergency; or

(B) A minor is engaged in an emergency errand and the minor has in his or her possession, if practicable, a written statement signed by the parent, which states that the errand is directly related to the health or safety of the parent or family member and that describes the nature of the errand and the health or safety emergency.

(e) If a police officer determines, based on all the information reasonably available, including any information offered by the person, that the person is under the age of 18 years, remains in or upon a street, park, or other outdoor public place in the District during the curfew hours, and none of the exceptions set forth in section 4 applies, the police officer shall take the person to the nearest available Police District headquarters. The police officer shall not handcuff the person when taking him or her to the nearest Police District headquarters as a result of a violation of this act.

(f) A minor who violates this act shall be detained by the Metropolitan Police force at the nearest available Police District headquarters and released into the custody of the minor's parent. The minor's parent or an adult person acting in loco parentis with respect to the minor shall be called to the Police District headquarters to take custody of the minor. A minor who is released to a person acting in loco parentis with respect to the minor shall not be taken into custody for violation of this act while returning home with the person acting in loco parentis. If no one claims responsibility for the minor, the minor shall be detained at the nearest available police district headquarters in a room that is not a cell or placed in the custody of the appropriate official of the Family Services Administration of the Department of Human Services and released at 6:00 a.m. that morning.

(g) A parent who violates this act shall be subject to a fine of not more than $100 for the second offense or $300 for any subsequent offense. No person shall be fined for the first violation of this act.

Sec. 5. Review Process.

(a) Five days, excluding Saturdays, Sundays, holidays and days of Council recess, prior to the expiration of this act, the Mayor shall report to the Council on the curfew's effectiveness and shall recommend that the curfew for minors either be continued or discontinued.

(b) Criteria by which effectiveness shall be measured include monthly statistics, by ward and police precinct, on:

(1) The number of minors detained and the number of persons fined as a result of a violation of this act;

(2) The number of criminal homicides and other narcotic trafficking related crimes of violence committed during the time that this act is in effect, by age and time of day; and

(3) The number of minors injured during the curfew hours as a result of crime and the cause of each injury.

Sec. 6. Records sealed.

Any law enforcement records or files of a minor attendant to a violation of this act shall be sealed by the Metropolitan Police force when the minor reaches the age of majority.

Sec. 7. Repeal.

The Short Term Curfew Emergency Act of 1989, effective March 15, 1989 (D.C. Act 8–5; to be codified at D.C.Code, sec. 6–1509 et seq.), is repealed.

Sec. 8. This act shall take effect upon its enactment (approval by the Mayor, or in the event of veto by the Mayor, override of the veto by the Council) and shall remain in effect for no longer than 90 days, as provided for emergency acts of the Council of the District of Columbia in section 412(a) of the District of Columbia Self–Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 788; D.C.Code, sec. 1–229(a)).

(s) <u>David Clark</u>
Chairman
Council of the District of Columbia

---

Mayor
District of Columbia