# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 01-4115

NANCY HODGKINS, COLIN HODGKINS, and
CAROLINE HODGKINS, by their next friend
and natural parent NANCY HODGKINS, on
their own behalf and on behalf of those
similarly situated,

*Plaintiffs-Appellants,*

*v.*

BART PETERSON, Mayor, in his official capacity
as mayor of the City of Indianapolis, Indiana,
JACK L. COTTEY, Sheriff, in his official capacity
as Marion County Sheriff, and SCOTT NEWMAN,
in his official capacity as Marion County Prosecutor,

*Defendants-Appellees,*
and

STATE OF INDIANA,

*Intervenor-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP-01-1032-C T/K—**John Daniel Tinder,** *Judge.*

_____

ARGUED MAY 31, 2002—DECIDED JANUARY 22, 2004

_____

Before HARLINGTON WOOD, JR., COFFEY, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. A parent and her minor children challenged Indiana's curfew law (Ind. Code §§ 31-37-3-2 and 31-37-3-3.5 ("curfew law")) claiming that the law violates the First Amendment rights of minors and impinges on the substantive due process rights of parents to raise and control the upbringing of their children. The district court denied the plaintiffs' motion for a preliminary injunction, holding that the curfew law—which contains an affirmative defense for minors arrested while participating in, going to, or returning from an activity protected under the First Amendment to the United States Constitution— did not threaten to curtail the First Amendment rights of juveniles and did not impede the due process rights of parents to direct their children's upbringing without undue interference from the government. Even with the affirmative defense, however, the new curfew leaves minors on their way to or from protected First Amendment activity vulnerable to arrest and thus creates a chill that unconstitutionally imposes on their First Amendment rights. Consequently, we reverse the decision of the district court.

## I.

Shortly after 11:00 pm on August 26, 1999, Colin Hodgkins and his three friends left a Steak 'n Shake restaurant in Marion County, Indiana where they had stopped to eat after attending a school soccer game.[1] As

---

[1] The facts described in this paragraph are those that gave rise to the Hodgkins' first challenge to the Indiana Curfew law. *See Hodgkins v. Goldsmith*, No. IP99-1528-C-T/G, 2000 WL 892964, at *3-7 (S.D. Ind. July 3, 2000). Following this challenge, the statute was revised and the Hodgkins challenged the new statute. Al-
(continued...)

they left the restaurant, police arrested and handcuffed them for violating Indiana's curfew regulation. The police took Colin and his friends to a curfew sweep processing site where he was given a breathalyser test and escorted to a bathroom where he was required to submit a urine sample to be tested for drugs. Later, both tests were determined to be negative. After the tests, a community volunteer interviewed Colin, asking him various personal questions about his friends and family including whether his family attended church. Two and a half hours later, at 1:30 a.m., a member of the Marion County Sheriff's Department went to the Hodgkins residence to inform Nancy Hodgkins that her son had been arrested and had to be picked up at the local high school. When she arrived to pick up her son, a community volunteer interviewed her and asked her personal questions about the Hodgkins family.

Colin's arrest spurred a series of legal challenges to the constitutionality of the statute, followed by subsequent revisions to the curfew law and culminating in the statute challenged in the instant case. At the time of Colin's arrest, the Indiana statute set a curfew of 11 p.m. on weekday nights and 1 a.m. on weekend nights as described below:

*Children fifteen through seventeen years of age*

Sec. 2. It is a curfew violation for a child fifteen (15), sixteen (16), or seventeen (17) years of age to be in a public place:

(1) between 1 a.m. and 5 a.m. on Saturday or Sunday;

---

[1] (...continued)
though the facts that follow are those that gave rise to the initial lawsuit and are not those of the case before us today, they are included in order to give context and background to the current dispute.

(2) after 11 p.m. on Sunday, Monday, Tuesday, Wednesday, or Thursday; or

(3) before 5 a.m. on Monday, Tuesday, Wednesday, Thursday, or Friday.

Ind. Code 31-37-3-2. A second statute made it unlawful for any child under the age of fifteen to be in any public place after 11 p.m. or before 5 a.m. on any day. Ind. Code 31-37-3-3. Violations of the latter provision constituted a delinquent act (Ind. Code 31-37-2-5) and could subject a parent to criminal liability. Ind. Code 31-37-2-5 (making it a crime to knowingly or intentionally encourage, aid, induce, or cause a person under eighteen years of age to commit an act of delinquency). A third statute in force at the time of Colin's arrest exempted from application of the curfew statute any child who was:

(1) accompanied by the child's parent, guardian, or custodian;

(2) accompanied by an adult specified by the child's parent, guardian or custodian; or

(3) participating in, going to, or returning from:

(A) lawful employment;

(B) a school sanctioned activity; or

(C) a religious event.

Ind. Code 31-37-3-1(repealed). Together, these statutes formed what we will call Indiana's prior curfew law.

Pursuant to a challenge by Colin, his mother, and a certified class of minors similarly situated, the district court determined that the statutes were constitutionally flawed as they lacked any exceptions for First Amendment activity. *Hodgkins v. Goldsmith*, No. IP99-1528-C-T/G, 2000 WL 892964, at *18 (S.D. Ind. July 3, 2000) ("*Hodgkins I*"). Following this decision, the defendants appealed. While the

appeal was pending, the Indiana General Assembly passed the current version of the curfew law, effective May 1, 2001, which is the subject of the instant appeal.[2]

Pursuant to Judge Tinder's holding that the prior curfew law was unconstitutional, the state legislature amended the statute to its current form. In doing so, the Indiana General Assembly repealed Ind. Code 31-37-3-1 (the statute listing exceptions to the curfew rule), kept the remainder of the statute intact and enacted a new Ind. Code 31-37-3-3.5 which, rather than creating an exception for First Amendment activity, created an affirmative defense for those engaged in protected expressive activity:

31-37-3-3.5 Defenses

Sec. 3.5.

* * *

(b) It is a defense to a violation under this chapter that the child engaged in the prohibited conduct while:

(1) accompanied by the child's parent, guardian, or custodian;

(2) accompanied by an adult specified by the child's parent, guardian, or custodian;

(3) participating in, going to, or returning from:

---

[2] After the district court declared the initial state curfew law unconstitutional, the City of Indianapolis enacted a curfew ordinance which Ms. Hodgkins challenged in a separate action solely on a due process claim. *Hodgkins v. Peterson*, No. IP-00-1410-C-T/G, 2000 WL 33128726 (S.D. Ind. 2000). After a denial of a preliminary injunction, Hodgkins appealed. The appeals of both matters were dismissed when the State of Indiana passed the new curfew law at issue in the present appeal. *Hodgkins v. Peterson*, Nos. 00-2919, 01-1093 (7th Cir. May 24, 2001).

(A) lawful employment;

(B) a school sanctioned activity;

(C) a religious event;

(D) an emergency involving the protection of a person or property from an imminent threat of serious bodily injury or substantial damage;

(E) an activity involving the exercise of the child's rights protected under the First Amendment to the United States Constitution or Article 1, Section 31 of the Constitution of the State of Indiana, or both, such as freedom of speech and the right of assembly; or

(F) an activity conducted by a nonprofit or governmental entity that provides recreation, education, training, or other care under the supervision of one (1) or more adults; or

(4) engaged in interstate or international travel from a location outside Indiana to another location outside Indiana.

The plaintiffs, unconvinced that the new affirmative defense for First Amendment activity cured the constitutional deficiency found by the district court in *Hodgkins I*, sought to preliminarily enjoin the enforcement of the new curfew law. Specifically, the plaintiffs asserted that the defense offered no real protection for minor plaintiffs involved in First Amendment activity who still might be vulnerable to arrest before they could assert a defense. The plaintiffs further maintained that the new curfew law violated the Fourteenth Amendment by unlawfully denying parents the autonomy to allow their children to be in public places unaccompanied during curfew hours.

Named plaintiff Nancy Hodgkins is a resident of Indianapolis, Indiana, and is the mother of named plaintiffs

Colin and Caroline Hodgkins. Ms. Hodgkins would like to allow her children to participate in the activities protected by the curfew law's First Amendment exception, however, she is concerned that if they do so, they will be subject to arrest. Ms. Hodgkins recognizes that if one of her children is arrested while participating in a First Amendment activity she and the child could later use that activity as a defense to the charges. She is nevertheless concerned about the potential expense and time involved in launching such a defense, and, we surmise, she is wary of again placing herself in a position where she will be summoned by the police in the middle of the night to come to a curfew processing center or detention center and of placing her children in a position where they will be subject to arrest, a breathalyser test, urine test, and an intrusive interview. Ms. Hodgkins states that she will certainly consider the risk of arrest when deciding whether to allow her children to participate in First Amendment activities after curfew. Consequently, she asserts that the current statute chills her children's ability to engage in these types of activities.

Furthermore, Ms. Hodgkins wishes to assert her rights as a parent to measure out more privileges and responsibilities to her children as they mature and grow more capable of acting responsibly with additional freedom. She believes that it is part of a parent's job to prepare a child for adulthood by doling out greater freedoms, including the freedom to remain out past curfew without being accompanied by an adult. She seeks a preliminary injunction against defendants Bart Peterson, in his official capacity as Mayor of the City of Indianapolis, Jack Cottey, in his official capacity as Sheriff of Marion County, and Scott Newman, in his official capacity as Prosecutor of Marion County, barring them from enforcing the new juvenile curfew law. The State of Indiana has intervened as a matter of right pursuant to 28 U.S.C. §

2403(b) to defend the constitutionality of the law.[3] Together, the defendants claim that the curfew law is constitutional and serves the compelling governmental interest in lowering the incidence of drug and alcohol use by youth, decreasing crime committed by and against minors, fostering parental involvement in children's conduct, and empowering parents who wish to set limits on their children's nighttime activities.

The named plaintiffs seek to assert their constitutional claims not merely on their own behalf, but on behalf of the following two classes as well: Class A—all residents of Marion County, who are under the age of eighteen, and Class B—all parents and legal guardians of persons who are residents of Marion County and who are under the age of eighteen. The District Court certified both classes on August 31, 2001.[4]

Holding that the plaintiffs had failed to make a clear showing of a likelihood of success on the merits of either of their claims, the district court denied the plaintiffs' motion for a preliminary injunction. *Hodgkins v. Peterson*, 175 F. Supp. 2d 1132, 1151 (S.D. Ind. 2001) *("Hodgkins II")*. With respect to the First Amendment claim, the court found that

---

[3] We refer to the State and local defendants together as "the defendants" or "the government."

[4] Although Colin, who was born on August 6, 1983, is no longer under the age of eighteen and thus subject to the limitations of the curfew law, it is well established that "[a] properly certified class has a legal status separate from and independent of the interests asserted by the named plaintiff." *Whitlock v. Johnson*, 153 F.3d 380, 383-84 (7th Cir. 1998). "[W]here a class has been properly certified, the mootness of the named plaintiff's individual claim does not render the class action moot." *Id.* Because another named plaintiff, Caroline, remains an appropriate class representative, the Class A claim may continue without the substitution of a new named representative for Colin. *See id.*

the curfew law did not reach a substantial amount of protected conduct and found only an incidental burden on minors' First Amendment rights. *Id.* at 1150. Furthermore, the court believed that the curfew law was narrowly tailored to serve the government's significant interests and that it left open ample alternative channels of communication. *Id.* at 1150-51. As for the Fourteenth Amendment claims, the district court held that parents do not have a fundamental right to allow minor children to be out in public with parental permission during the curfew hours (*Id.* at 1161) and, in any event, even if they did, that the curfew law could survive strict scrutiny as it was narrowly tailored to serve compelling governmental interests. *Id.* at 1166. The plaintiffs filed a timely appeal.

## II.

In reviewing the district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, and its legal conclusions de novo. *Jones v. Infocure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002). Ordinarily, to succeed on a motion for a preliminary injunction, the party seeking the injunction must make an initial showing (1) that her case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) she will suffer irreparable harm if the injunction is not granted. *FoodCom Int'l. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). In this case, the only issue in play is the first—that is, whether the plaintiffs have adequately shown that they are likely to succeed on the merits of their claim. The district court below found, and the government defendants do not dispute, that the plaintiffs had successfully established all of the other elements required for a preliminary injunction. *Hodgkins II*, 175 F. Supp. 2d at 1139.

As the Second Circuit recently has noted, juvenile curfew

laws have existed throughout our nation's history, and state and local governmental attempts at enacting constitutional curfew statutes have met with varying degrees of success. *See Ramos v. Town of Vernon*, No. 01-7118, 2003 WL 22989226, at *1 (2d Cir. June 2, 2003)(*amended* Dec. 19, 2003) (Equal Protection challenge to curfew law). In this case, the plaintiffs are concerned with two burdens that the Indianapolis curfew law imposes: the burden on the First Amendment rights of the youths themselves and the burden on the due process rights of the parents and legal guardians to direct their children's upbringing.

We must begin by exploring the baseline question: Do minors have a fundamental right to freedom of expression worthy of constitutional protection? The Supreme Court answered this question affirmatively in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 89 S. Ct. 733, 739 (1969). It is oft said that those rights are not co-extensive with the rights of adults, at least in the context of the rights of students in public schools. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S. Ct. 3159, 3164 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988). The question as to whether a minor's First Amendment rights are diluted outside of the school context is not as clear. *Hazelwood*, 484 U.S. at 266, 108 S. Ct. at 567 (noting that student speech which disrupts the educational environment need not be tolerated "even though the government could not censor similar speech outside the school").

The strength of our democracy depends on a citizenry that knows and understands its freedoms, exercises them responsibly, and guards them vigilantly. Young adults, as Judge Tinder pointed out, are not suddenly granted the full panoply of constitutional rights on the day they attain the age of majority. We not only permit but expect youths to exercise those liberties—to learn to think for themselves, to give voice to their opinions, to hear and evaluate competing

points of view—so that they might attain the right to vote at age eighteen with the tools to exercise that right. *Am. Amusement Mach. Assoc. v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). A juvenile's ability to worship, associate, and speak freely is therefore not simply a privilege that benefits her as an individual, but a necessary means of allowing her to become a fully enfranchised member of democratic society. "People are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Id.* In short, minors have First Amendment rights worthy of protection. How we balance those rights against other legitimate governmental interests is, of course, the key question in this case and will be discussed at length below.

The Hodgkins maintain that the revisions to the curfew law have not cured the constitutional defect found in the previous version of the law which was struck down by the district court in *Hodgkins I*. The affirmative defenses added to the revised curfew law, they argue, do not adequately protect minors' First Amendment rights, as the curfew law requires them to subject themselves to arrest— including the possibility of breathalyser tests, urine tests and intrusive questioning abut their family life—and then prove at a later time that the activity they were engaging in fell within the affirmative defense for First Amendment activity. They assert that the consequences of violating the curfew law are so burdensome and intrusive that, rather than risk arrest, they will be discouraged from participating in expressive activity during curfew hours. In other words, the plaintiffs claim that the curfew regulation creates a "chill" that imposes on their First Amendment rights. The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights. *City of Houston, Texas v. Hill*, 482 U.S. 451, 459, n.7, 107 S. Ct. 2502, 2508, n.7 (1987); *Steffel v. Thompson*, 415 U.S. 452, 462, 94 S. Ct. 1209, 1217 (1974); *Babbitt v. United Farm*

*Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.").

Most often in this context, plaintiffs launch First Amendment challenges pursuant to the overbreadth doctrine. The overbreadth doctrine allows an attack on the facial validity of a statute even though the conduct of the person attacking the statute could be regulated by a statute drawn with the requisite narrow specificity. *Dombrowski v. Pfister*, 380 U.S. 479, 486-87, 85 S. Ct. 1116, 1121 (1965). The theory behind the doctrine is that a "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 2916 (1973). "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958, 104 S. Ct. 2839, 2847 (1984). In short, "[t]he First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges." *Virginia v. Hicks*, ___ U.S. ___, ___, 123 S. Ct. 2191, 2196 (2003). The plaintiffs in this case assert their legitimate intention to engage in the protected expression themselves and therefore, as a technical matter, they need not really rely on the overbreadth doctrine to assert their facial challenge. *See Nunez v. City of San Diego*, 114 F. 3d 935, 949 (9th Cir. 1997); *Waters v. Barry*, 711 F. Supp. 1125, 1133-34 (D. D.C. 1989). This is particularly so, where a plaintiff class has been certified which includes everyone who might be affected by the statute. *Waters*, 711 F. Supp. 2d at 1133.

Nevertheless, the plaintiffs may launch a facial attack on their own behalf if the statute creates an unacceptable risk of suppression of ideas. *Joseph H. Munson Co.*, 467 U.S. at 965, n.13, 104 S. Ct. at 2851, n.13. The distinction in this context is merely an academic one, for in either case the plaintiffs may seek to strike down the ordinance on its face. *See Nunez*, 114 F.3d at 949 (citing *Waters*, 711 F. Supp. at 1133-34).

Having determined that the statute is one that is eligible for facial attack, our next task is to decide through which of the many First Amendment lenses we will analyze the constitutionality of the curfew law. The plaintiffs do not maintain that the legislature's purpose in enacting the ordinance was to regulate the content of their expressive activity and indeed it seems clear that it was not. The curfew ordinance was enacted to regulate conduct (minors in public at night), but could be seen as having the incidental effect of burdening speech and is therefore subject to the four-prong analysis established in *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968). The statute in this case could also be described as a law that merely regulates the time, place, and manner of speech and thus subject to the analysis enunciated in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746 (1989). The approach we choose has no real effect on the outcome of the case, as the *O'Brien* analysis and the *Ward* time, place and manner analysis are really just variations on the same principal. *See Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 714 (7th Cir. 2003) (noting that for all practical purposes, the distinction between the two tests is irrelevant and that the Supreme Court has held that the two tests embody the same standards (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S. Ct. 2456, 2460 (1991) (plurality opinion))). They are tests that apply an intermediate level of scrutiny to

content neutral government regulations affecting speech.[5]

These intermediate scrutiny tests can be applied only to governmental regulation of conduct that has an expressive element or to regulations directed at activity with no expressive component but which nevertheless impose a disproportionate burden on those engaged in protected First Amendment activity. *Acara v. Cloud Books, Inc.*, 478 U.S. 697, 703-04, 106 S. Ct. 3172, 3175-76 (1986). The government claims that plaintiffs cannot mount a facial challenge to the curfew law under *O'Brien* or *Ward* because they have not demonstrated either that the curfew law imposes a disproportionate burden on those engaged in First Amendment activities or that it regulates conduct with an expressive element.

We agree that the Indiana curfew ordinance does not disproportionately impact First Amendment rights. As Colin Hodgkins can attest, it burdens minors who want to attend soccer games as much as it burdens those who wish to speak at a political rally. *See Nunez*, 114 F.3d 935, 950 (finding that the San Diego ordinance did not dispropor-tionally burden First Amendment rights). On the other

---

[5] Other courts that have reviewed curfew laws challenged on Equal Protection grounds and the right to travel or to free move-ment have struggled to decide whether minors' constitutional rights should be subject to strict scrutiny, intermediate scrutiny, or an amalgam of both. *See Ramos*, 2003 WL 22989226, at *5-6 (including discussion of the various methodologies courts have chosen to incorporate the status of minors into the Equal Protec-tion framework). We find it unnecessary to reach any conclusion regarding the level of scrutiny minors should receive in Equal Protection cases, as the minor plaintiffs in this case challenge the statute on First Amendment grounds only. As we will discuss further, under this type of First Amendment challenge to a content neutral statute, a level of intermediate scrutiny an-nounced in *O'Brien* and *Ward* applies.

hand, the curfew ordinance regulates minors' abilities to engage in some of the purest and most protected forms of speech and expression. As Judge Tinder recognized, a wide range of First Amendment activities occur during curfew hours, including political events, death penalty protests, late night sessions of the Indiana General Assembly, and neighborhood association meetings or nighttime events. *Hodgkins I*, 2000 WL 892964, at *10. A number of religions mark particular days or events with late-night services, prayers, or other activities: many Christians, for example, commemorate the birth of Christ with a midnight service on Christmas Eve and the Last Supper with an all-night vigil on Holy Thursday; Jews observe the first night of Shavuot by studying Torah all through the night; and throughout the month of Ramadan, Muslims engage in late-evening prayer. Late-night or all-night marches, rallies, and sleep-ins are often held to protest government action or inaction. And it is not unusual for political campaigns, particularly in the whirlwind final hours before an election, to hold rallies in the middle of the night. Thus, during the last weeks of the 1960 presidential campaign, then-Senator John F. Kennedy addressed a group of University of Michigan students at 2:00 a.m. on the steps of the Michigan Union. In unprepared remarks, he asked the students whether they would be willing to devote a few years of their lives working in underdeveloped countries in order to foster better relations between the people of those nations and the United States. The students responded with a petition calling for the creation of the Peace Corps, which came into being the following year. These are but a few examples. The curfew ordinance regulates access to almost every form of public expression during the late night hours. The effect on the speech of the plaintiffs is significant.

Despite this extensive regulation, the State of Indiana argues that the curfew law is a general regulation of conduct and not a regulation of expressive conduct. The State

likens this case to *Acara*, 478 U.S. at 697, 106 S. Ct. at 3172, where a bookstore owner challenged the government closure of the store pursuant to a public health statute which allowed the state to close any business being used for prostitution or lewd conduct. The Supreme Court in *Acara* concluded that the regulation did not impose a dispropor-tionate burden on those engaged in First Amendment activity nor did it involve a government regulation of conduct that has an expressive conduct; after all, illegal sexual activity, the Court opined, "manifests absolutely no element of protected expression." *Id.* at 705, 106 S. Ct. at 3176. Consequently, because the ordinance neither regu-lated conduct with an expressive element nor imposed a disproportionate burden on those engaged in protected First Amendment activity, it could not be subjected to the "least restrictive means" test of *O'Brien* and the ordinance was upheld. The *Acara* court, however, distinguished the case before it from prior Supreme Court cases where it found unconstitutional regulations in which the nonspeech subjected to the government regulation was intimately related to the expressive conduct protected under the First Amendment. *Id.* at 706, n.3, 3177, n.3 (*citing Marsh v. Alabama*, 326 U.S. 501, 66 S. Ct. 276 (1946) (prosecution under trespass law against persons distributing religious literature); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S. Ct. 900 (1940) (prosecution under breach of peace law against persons distributing religious literature)). It is easy to see how the *Acara* court found that the conduct which the government sought to regulate in that case—various forms of illegal sexual activity—was unrelated to the protected First Amendment activity of selling books. In this case, however, the government regulation of nonspeech (the nocturnal activity of minors) is intimately related to the expressive conduct at issue. Being out in public is a neces-sary precursor to almost all public forums for speech, expression, and political activity. *See Nunez*, 114 F.3d at

950. Its relationship to expressive conduct is intimate and profound.

Similarly, the recent Supreme Court decision in *Hicks*, ___ U.S. at ___, 123 S. Ct. at 2191 cited by both defendants in supplemental authority submitted to this court is of no help on this front. The trespass law at issue in that case barred those with "no legitimate business or social purpose" from the streets of a public housing authority. *Id.* at 2195. The plaintiff's overbreadth challenge failed in that case because he could not demonstrate that the trespass policy would be applied to anyone engaged in protected First Amendment activity. *Id.* at 2198. The term "legitimate business and social purposes," the court surmised, could include constitutionally protected speech. *Id.* In this case, however we know that the ordinance applies to constitutionally protected speech. All parties agree that minors who are out walking to the Governor's residence to protest an early morning execution are subject to arrest (*Hodgkins II*, 175 F. Supp. 2d at 1148) as are all other minors engaged in protected First Amendment activity during curfew hours. As the examples above demonstrate, the application of the law to protected speech in this case is substantial, even in relation to the scope of the law's plainly legitimate sweep. *Hicks*, ___ U.S. at ___, 123 S. Ct. at 2197. Consequently, the curfew law warrants review under the *O'Brien* or *Ward* tests described above and applied below.

In order not to offend the First Amendment, a statute that regulates the time, place, and manner of expression must be (1) content neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) allow for ample alternative channels for the expression. *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753. The *O'Brien* standard for content neutral regulations which incidentally impact expression requires: (1) that the regulation is within the constitutional power of the government; (2) that it furthers an important

or substantial governmental interest; (3) the governmental interest must be unrelated to the suppression of free expression (in other words, content neutral); and (4) the incidental restriction on alleged First Amendment freedoms must be no greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377, 88 S. Ct. at 1679. There is no dispute that the curfew law is content neutral and was within the power of the Indiana legislature to pass—knocking out the first prong of the *Ward* test and the first and third prongs of the *O'Brien* test. The lynchpin questions in this case then are first, whether the curfew law furthers an important or substantial governmental interest and, second, whether the restrictions imposed by the curfew regulation are no greater than are essential to further that interest (*Id.* at 377, 88 S. Ct. at 1679) or in the words of the *Ward* court— whether the statute is narrowly tailored to serve a significant governmental interest (*Ward*, 491 U.S. at 791, 109 S. Ct. at 2753)—and second, whether the curfew law allows for ample alternative channels for expression. *Id.*

The district court found that the curfew law advanced the important governmental interest in providing for the safety and well-being of children and combating juvenile crime. *Hodgkins II*, 175 F. Supp. 2d at 1150. Even the plaintiffs agree that the interests asserted by the government are legitimate (though they stop short of calling the interests substantial or important). And we agree that they are indeed important and substantial. *See Ramos*, 2003 WL 21257959, at *10 (town has legitimate interest in protecting minors from harm at night and protecting the general population from nighttime juvenile crime); *Nunez*, 114 F.3d at 945-46 (government has a compelling interest in protecting the community from juvenile crime and in protecting the safety and welfare of its minors); *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (city has a compelling interest in reducing juvenile crime and victimization and promoting

juvenile safety and well-being), *cert. denied*, 511 U.S. 1127, 114 S. Ct. 2134 (1994).

The question remains, however, whether the nexus between the curfew law and those significant governmental interests is close enough to pass constitutional muster. Whether we call it "narrowly tailored" or "no more burdensome than is essential" is of no moment. *See Ward*, 491 U.S. at 798, 109 S. Ct. at 2757 ("we have held that the *O'Brien* test in the last analysis is little, if any, different from the standard applicable to time, place, or manner restrictions"). We look to see whether the curfew law is no more restrictive than necessary to further the governmental interest. The law does not require that the State of Indiana use the least restrictive means to meet its goal (that would, of course, be what we would require were we applying strict scrutiny. *See id.* at 798, 109 S. Ct. at 2757-58). Nor can the government slide through the test merely because another alternative would not be quite as good. Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 9:17 (2003).

Under the "no more restrictive than necessary" standard, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799, 109 S. Ct. at 2758 (citation omitted). The district court in *Hodgkins I* concluded that without the affirmative defense, the curfew ordinance indeed did burden speech more than was necessary to serve the state's legitimate interests. *Hodgkins I*, 2000 WL 892964, at *10-11. After the affirmative defense for First Amendment activity was added, however, the district court concluded that the defense sufficiently protected children's abilities to engage in protected communication during curfew hours. *Hodgkins II*, 175 F. Supp. 2d at 1150-51. After all, the court noted,

> an officer would not have probable cause to arrest children who appear to be under the age of 18 and who

> also appear to be participating in an early morning protest at the Governor's residence. Similarly, an officer would not have probable cause to arrest children apparently under the age of 18 attending Midnight Mass at the Cathedral. In those cases, the officer would have knowledge of facts and circumstances which would conclusively establish the First Amendment activity affirmative defense; the officer would not have to conduct any investigation into the defense as it would be readily apparent that the children were engaging in protected activity.

*Hodgkins II*, 175 F. Supp. 2d at 1149.

But there is no reason to think that the minors whom the affirmative defense will shield from arrest represent most or even many of those who are at risk of being stopped by the police. A police officer has probable cause to arrest when "the facts and circumstances *within the officer's knowledge . . .* are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632 (1979) (emphasis ours). Under Indiana law, "[r]easonable suspicion exists where the facts *known to the officer*, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999) (emphasis ours). Once a police officer discovers sufficient facts to establish probable cause, she has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence. *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995); s*ee also Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998) (validity of affirmative defense is irrelevant to whether or not police officer sued for false arrest had

probable cause to make arrest); *Hodgkins II*, 175 F. Supp. 2d at 1146 (collecting cases). A police officer may not ignore conclusively established evidence of the existence of an affirmative defense, *Estate of Deitrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999), but the officer has no duty to investigate the validity of any defense. *Baker v. McCollan*, 443 U.S. 137, 145-46, 99 S. Ct. 2689, 2695 (1979). In fact, both the defendants in this case and the court below, ruling in their favor, conceded that a police officer need not investigate an individual's claim of an affirmative defense to determine facts unknown to the officer. *See Hodgkins II*, 175 F. Supp. 2d at 1147. A legislature can draft a curfew law which specifies that a law enforcement official must look into whether an affirmative defense applies before making an arrest. *See Hutchins v. District of Columbia*, 188 F.3d 531, 535 (D.C. Cir. 1999) (*en banc*) (noting that before police officer may detain juvenile for violation of District of Columbia's curfew ordinance, officer must "reasonably believe . . . that an offense has occurred under the curfew law *and* that no defense exists") (emphasis ours); *Qutb*, 11 F.3d at 490-91 (noting that Dallas curfew ordinance requires police officer to inquire into minor's reasons for being in public place during curfew hours and permits officer to issue citation or make arrest "only if the officer reasonably believes that the person has violated the ordinance *and* that no defenses apply") (emphasis ours). The Indiana Legislature did not impose that requirement.

Thus, a police officer who actually sees a sixteen-year-old leaving a late-night religious service or political rally could not properly arrest the youth for staying out past curfew. But, as Judge Tinder held, the statute's affirmative defenses do not compel the officer to look beyond what he already knows in order to decide whether one of the affirmative defenses applies. *Hodgkins II*, 175 F. Supp. at 1148. Thus, if a police officer stops a seventeen-year-old on the road at 1:00 a.m., and the teen informs the officer that she

is returning home from a midnight political rally, the officer need not take the teen at her word nor attempt to ascertain whether she is telling the truth. Lacking first-hand knowledge that the juvenile indeed has been participating in First Amendment activity, the officer is free to arrest her and leave assessment of the First Amendment or any other affirmative defense for a judicial officer. As Judge Tinder acknowledged:

> To be sure, an officer observing a child who appears to be under the age of 18 out walking during curfew hours does not have to investigate the child's assertion that he is returning from or going to a religious or political activity. So, children who appear to be under the age of 18 who are out during curfew hours walking to the Governor's residence to protest an early morning execution might be arrested. This is because the officer might have to investigate whether the children are in fact walking to the Governor's residence to the protest, and the officer is not required to undertake such an investigation in determining probable cause.

*Hodgkins II*, 175 F. Supp. at 1148. Any juvenile who chooses to participate in a late-night religious or political activity thus runs the risk that he will be arrested if a police officer stops him en route to or from that activity and he cannot prove to the officer's satisfaction that he is out after hours in order to exercise his First Amendment rights.

Consequently, because the defense imposes no duty of investigation on the arresting officer, as a practical matter it protects only those minors whom the officer has actually seen participating in protected activity. This strikes us as a small subset of minors participating in late-night First Amendment activities, and therefore we conclude that the statute reaches a substantial amount of protected conduct. Most religious and political events occurring during curfew hours are organized and attended by adults, so even as-

suming that police routinely monitor such events, they would have no reason to suspect that any particular juvenile taking part in one of these events is doing so unaccompanied by a parent or other responsible adult. Only when the minor is observed by himself or solely in the company of other minors would a police officer have reason to believe that he is in public after hours unaccompanied by a responsible adult. Indeed, if an unaccompanied minor comes to the attention of the police at all, it is much more likely that he will do so while traveling the relatively deserted public way to or from the late-night First Amendment activity, not in the midst of the activity itself.

Furthermore, we think the district court took too narrow a view when determining that the curfew law left open adequate alternative channels of communication. Judge Tinder noted that minors could engage in protected activity during the ample non-curfew hours, during curfew hours under the shield of the affirmative defense, when accompanied by an authorized adult, or within the confines of their home by telephone or through the internet. No doubt many if not most of the participants would find it more convenient to exercise their First Amendment rights other than in the dead of night. It is by no means a coincidence, however, that so many of the expressive activities we illustrated above occur late in the evening. In some instances, the late hour of the activity may be dictated by necessity—as, for example, when citizens wish to observe or influence a legislative session that extends into the late hours, or a down-to-the-wire election postpones a celebration for the winning candidate until the wee hours of the morning. More often, however, the late hour is closely linked with the purpose and message of the activity. Take Back the Night marches and rallies frequently extend to and after midnight in order to protest the crimes that jeopardize the security of women at night. Executions of prisoners on death row often are carried out shortly after midnight or in the early hours of

the day, and so are routinely attended by all-night vigils held by those for and against the death penalty. Kristallnacht (Night of Glass) is commemorated with late-night prayers and vigils because it was after midnight one evening sixty-five years ago when Nazi hooligans looted and destroyed Jewish businesses, homes, and synagogues in Germany. In the final days of Ramadan, mosques remain open all night so that Muslims may mark Lailat al-Qadr (Night of Power), the night when the prophet Mohammed first received revelations from the angel Jibra'el (Gabriel), by holding vigil in prayer, Qur'anic reading, and contemplation. And it was after midnight one evening in October 1998 when young Matthew Shepard was beaten, burned, and lashed to a fence, and left for dead outside of Laramie, Wyoming; and so it is that candlelight vigils were and are held in the middle of the night to protest the homophobia that motivated his killers. Thus, to the extent that the curfew prevents a minor from being outside of the home during curfew hours, it does not mean simply that she must shift the exercise of her First Amendment rights to non-curfew hours or to the telephone or internet; it means that she must surrender her right to participate in late-night activities whose context and message are tied to the late hour and the public forum. There is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person, praying in the sanctuary of one's choice side-by-side with other worshipers, feeling the energy of the crowd as a victorious political candidate announces his plans for the new administration, holding hands with other mourners at a candlelight vigil, or standing in front of the seat of state government as a legislative session winds its way into the night. "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91, 108 S. Ct. 2667, 2674 (1988),

and, we add, when to say it. And although an adequate alternative for expression does not have to be the speaker's best or first choice, it must provide the speaker with sufficiently adequate alternatives. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002), *cert. denied*, 124 S. Ct. 78 (2003).

Granted, Indiana's curfew does not forbid minors from exercising their First Amendment rights during curfew hours, but it does forcefully discourage the exercise of those rights. The First Amendment defense will shield a minor from conviction, assuming that she can prove to the satisfaction of a judge that she was exercising her First Amendment rights, but, as discussed, it will not shield her from arrest if the officer who stops her has not actually seen her participating in a religious service, political rally, or other First Amendment event. *Hodgkins II*, 175 F. Supp. 2d at 1148. The prospect of an arrest is intimidating in and of itself; but one should also have in mind what else might follow from the arrest. Recall that Colin Hodgkins was picked up in one of Marion County's curfew sweeps as he and his friends were leaving the Steak 'n Shake restaurant after enjoying a bite to eat on their way home from a soccer game. Upon arrival at the sweep processing site, and pursuant to standard curfew sweep procedures, Colin was required to undergo a breathalyser test (for alcohol use) as well as a urinalysis (for cocaine and marijuana use). He was then required to speak with a community volunteer, who asked him a series of questions from a form, including questions about his friends and family, and whether his family attended church. At 1:30 a.m.—two and a half hours after Colin was arrested—a deputy sheriff arrived at the Hodgkins residence and advised Colin's mother that she would have to come to the sweep processing site in order to pick him up. Once there, she too was questioned by a volunteer about Colin's family life. *See Hodgkins I*, 2000 WL 892964, at *3-*4, *6. We have no doubt that the

authorities are well meaning in administering the drug and alcohol testing and in questioning the minor and his parents about his friends and family life. But these are also rather serious intrusions upon one's personal and familial privacy, and they represent a substantial price for a minor to have to pay in order to take part in a late-night political or religious event. The chill that the prospect of arrest imposes on a minor's exercise of his or her First Amendment rights is patent.

The only way that a minor can avoid this risk is to find a parent or another adult designated by his parent to accompany him. *See* Ind. Code. § 31-37-3-3.5(b)(1), (2).[6] But that alternative itself burdens a minor's expressive rights: adults may be reluctant or unable to accompany the minor to a late-night activity; a seventeen-year-old attending college away from home may be unable to recruit a parent or designated adult; and the minor himself may decide that participation is not worth the bother if he must bring a parent or other adult along with him. To condition the exercise of First Amendment rights on the willingness of an adult to chaperone is to curtail them. *Am. Amusement Mach. Ass'n*, 244 F.3d at 578. Furthermore, "alternative channels of communication must be more than merely theoretically available. They must be realistic as well." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000).

In sum, we hold that the curfew law, even with the new

---

[6] Like participation in activity protected by the First Amendment, being out past curfew with a parent or other designated adult is an affirmative defense to a curfew violation, rather than an exception from the prohibition. Ind. Code. § 31-37-3-3.5(b)(1), (2). But the risk of arrest in that situation is obviously slight, for an officer who sees the minor in the company of an adult would typically have no reason to believe that the affirmative defense does not apply.

affirmative defenses for First Amendment activity, is not narrowly tailored to serve a significant governmental interest and fails to allow for ample alternative channels for expression. The statute restricts a minor's access to any public forum during curfew hours, and the affirmative defense for participating in First Amendment activities does not significantly reduce the chance that a minor might be arrested for exercising his First Amendment rights. Under these circumstances, a facial challenge is both appropriate and necessary. As-applied review would require a minor to suffer arrest and the attendant consequences before a court would consider the constitutionality of the curfew; and neither a minor nor his parents should have to pay that penalty before mounting a challenge to the statute. *See generally Hicks*, ___ U.S. at ___, 123 S. Ct. at 2196. The concrete possibility of arrest at the same time makes clear that the statute unduly chills the exercise of a minor's First Amendment rights. In that respect, the current version of the statute fares no better than the prior version, which contained no provision at all for the exercise of a minor's First Amendment rights and which Judge Tinder appropriately found unconstitutional.[7] *Hodgkins I*, 2000 WL 892964,

---

[7] The defendants ask this Court to revisit the question of whether a First Amendment affirmative defense is necessary at all. Our conclusion in this case should put that issue to rest. We note, as Judge Tinder did when considering the original version of the curfew statute, that in every reported federal case which has upheld curfew laws against various constitutional challenges the curfew has contained a broad exemption for First Amendment activities. *See, e.g.*, *Ramos*, 2003 WL 22989226, at *1 (petition for rehearing pending); *Hutchins*, 188 F.3d at 535 (although called an affirmative defense, the ordinance explicitly required that before making an arrest, a police officer must determine that no valid defenses existed. Logically, then, although labeled a "defense," the requirement was really an element of the offense); *Qutb*, 11 F.3d
(continued...)

at *27. Consequently, we reverse the judgment and remand with directions to enjoin the enforcement of Indiana's curfew until such time as the State's legislature removes the chill that the statute places on the exercise of First Amendment rights by minors. Although this case is before us on the appeal of a denial of a motion for preliminary injunction, given the manner in which the parties and district court agree that the affirmative defenses will operate, the constitutional defect in this case is clear. There is no need for further proceedings on this matter and judicial efficiency will best be served with an instruction to the district court to permanently enjoin the enforcement of the curfew law.

Although this disposition renders it unnecessary to reach the plaintiff parents' due process claim, the nature of the curfew's affirmative defenses leads us to make one final observation about that claim. The premise of the due process claim is that parents have a right to make decisions about their children's upbringing without undue interference by the state. Courts sustaining curfew laws against this type of claim typically cite the laws' exceptions and defenses as evidence that the laws interfere only minimally with parental authority. *See Hutchins*, 188 F.3d at 545; *Schleifer*, 159 F.3d at 853; *Qutb*, 11 F.3d at 495-96; *Bykofsky*, 401 F. Supp. at 1264; *cf. Nunez*, 114 F.3d at 952 (curfew statute with no exception other than for accompaniment by parent unduly interferes with parental decision-making). In this case, the exceptions covering a broad

---

[7]  (...continued)
at 490-91 (same); *Schleifer v. City of Charlottsville*, 159 F.3d 843, 846 (4th Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999); *Bykofsy v. Borough of Middletown*, 401 F. Supp. 1242, 1247 (M.D. Pa. 1975), *aff'd* 535 F.2d 1245 (3d Cir. 1976), *cert. denied*, 429 U.S. 964 (1976). The Indiana law is no exception.

variety of circumstances do give parents greater flexibility to allow their children to stay out after hours and in that way minimize the interference with parental autonomy. But the affirmative defenses in the Indiana curfew statute present a risk that a minor will be arrested whenever the arresting officer lacks direct knowledge that the minor is on an emergency errand, coming from a school sanctioned activity, or engaging in some other activity encompassed by the specified defenses. For that reason, we are not convinced that the affirmative defenses actually do minimize the state's restraint on parental authority in a manner sufficient to overcome a constitutional attack. Nevertheless, we leave that determination for another day.

REVERSED AND REMANDED.


A true Copy:

Teste:


_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*


USCA-02-C-0072—1-22-04